IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No.: 7:14-CV-9-FL

|  |  |  |
|---|---|---|
| CHARLES NANCE, ANDREA NANCE, CAROLINA SHORES HEALTHCARE, PLLC, and ALL THOSE SIMILARLY SITUATED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | MEMORANDUM AND RECOMMENDATION |
| JOHN INGRAM, *in his individual and official capacity as Sheriff of Brunswick County*, and WESTERN SURETY COMPANY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter comes before the court on Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [DE-24]. Plaintiffs filed a response in opposition [DE-32], and Defendants filed a reply [DE-35]. All responsive briefing is complete, and the matters are ripe for disposition. The parties have not consented to the jurisdiction of the magistrate judge; therefore, Defendants' motion is considered here as a recommendation to the District Court. *See* 28 U.S.C. § 636(b)(1)(B); *see also* Local Civil Rule 72.3(c). For the reasons set forth below, it is recommended that Defendants' motion for summary judgment [DE-24] be allowed.

## I. STATEMENT OF THE CASE

Plaintiffs, Charles Nance and Andrea Nance (collectively, the "Nances") and Carolina Shores Heathcare, PLLC ("Carolina Shores") (altogether, the "Plaintiffs"), initially filed a verified complaint in the Superior Court of Brunswick County alleging Defendant John Ingram, the Sheriff of Brunswick County, North Carolina, ("Sheriff Ingram") violated the Nances' civil rights and

interfered with Andrea Nance's business, Carolina Shores, after the Nances supported a candidate opposing Sheriff Ingram in the 2010 Republican primary for Brunswick County Sheriff. Compl. [DE-1-1]. Plaintiffs specifically assert a federal claim under 42 U.S.C. § 1983 for alleged violations of the Hatch Act, 5 U.S.C. § 1501 *et seq.*, and their right to freedom of speech, due process, and equal protection under the First, Fifth, and Fourteenth Amendments, as well as state law claims of defamation and slander *per se*, tortious interference with prospective economic advantage, intentional infliction of emotional distress, and negligent infliction of emotional distress for which Plaintiffs seek compensatory and punitive damages. *Id.* Defendant Western Surety Company was included in the action as the surety on Sheriff Ingram's official sheriff's bond. *Id.* Defendants timely removed the action to this court pursuant to 42 U.S.C. § 1441, invoking the court's federal question jurisdiction. Notice of Removal [DE-1]. The court entered a case management order, and the parties proceeded to discovery. [DE-11]. After the close of discovery, Defendants timely filed the instant motion for summary judgment. [DE-24].

## II. STATEMENT OF FACTS

The relevant undisputed facts are as follows:[1]

The Nances are a married couple and have lived in Brunswick County, North Carolina for approximately 16 years. Charles Nance has been an officer with the North Carolina Highway Patrol for 20 years, and Andrea Nance has been a nurse practitioner for ten years, operating Carolina Shores since March 2005. In 2010, the Nances made a financial contribution to the campaign of Tim

---

[1] The claims asserted in the complaint by Charles Nance were conceded in Plaintiffs' response to Defendants' summary judgment motion. Pls.' Resp. [DE-32] at 8-20. Plaintiffs also purport to bring suit on behalf of "all those similarly situated," yet have never identified any other such individuals or pursued class certification. Accordingly, the relevant facts recited here relate to the remaining claims of Andrea Nance and Carolina Shores.

2

Daniels who was running against Sheriff Ingram in the 2010 Republican primary for Brunswick County sheriff. Sheriff Ingram had been initially appointed in May 2008 and ran as the incumbent in 2010. Daniels lost the primary, and Sheriff Ingram was elected in November 2010. Compl. [DE-1-1] ¶¶ 10-13, 15-16, 18; Defs.' Br. [DE-25] at 2; Aff. of Sheriff John Ingram ("Ingram Aff.") [DE-26] ¶ 1.

In April 2011, Ashli Daniels (at that time the wife of Tim Daniels) was arrested for forging prescriptions. Decl. of Ashli Basily (formerly, Ashli Daniels) "Daniels Decl." [DE-33] ¶¶ 6-7. Daniels had been a patient of Andrea Nance at Carolina Shores. *Id.* ¶ 13. On April 19, 2011, Daniels spoke with Detective Israel West ("Detective West") and Agent Joe Cherry ("Agent Cherry") of the Brunswick County Sheriff's Office (the "BCSO") and Agent Kelly Eason ("Agent Eason") of the North Carolina State Bureau of Investigation ("SBI"). *Id.* ¶ 5. It is disputed whether Detective West initially asked Daniels to cooperate in an investigation of Nance (i.e., request a prescription or pain medication from Nance) in exchange for assistance on Daniels' charges, *id.* ¶¶ 9-12, or whether when asked if there was anyone Daniels could get pills from, Daniels volunteered that she had received pills from Nance in the past when she was not a patient of Nance, Dep. of Israel West ("West Dep.") [DE-24-5] at 46-47. In any event, Daniels initially agreed to cooperate, but then later elected not to do so. Daniels Decl. [DE-33] ¶¶ 13, 20; West Dep. [DE-24-5] at 51.

In March or April of 2011, Brunswick County Assistant Coroner David Crocker, who is also a part-time Deputy Sheriff in Brunswick County, initiated a meeting with Detective West and Agent Cherry after Crocker found six deaths in a little more than a year with a connection to Nance's prescriptions and became concerned. Aff. of David Crocker ("Crocker Aff.") [DE-27] ¶¶ 4-6. Around this same time, Special Agent Mac Warner of the SBI received an inquiry from a coroner

3

or sheriff's detective regarding Andrea Nance's prescription practices following a traffic accident involving multiple deaths in Brunswick County where the driver was in possession of drugs prescribed by Nance. Aff. of W. Mac Warner III ("Warner Aff.") [DE-28] ¶ 7. Agent Warner requested the SBI's Diversion Unit review a statewide database for reporting controlled substances to see if there was anything out of the ordinary regarding Nance's prescribing practices and was informed nothing out of the ordinary was discovered. *Id.* ¶ 8. On April 27, 2011, Detective West, Agent Cherry, and Crocker met with David Allen, an investigator from the North Carolina Board of Nursing (the "Nursing Board"), regarding Andrea Nance. Crocker Aff. ¶ 6. Crocker provided the investigator with a copy of a log prepared by Crocker containing calls he responded to from January 2008 to February 2011, noting four deaths (not including the deaths from the traffic accident) between late 2009 and early 2011 where the victims were using prescription pain medications obtained from Nance at Carolina Shores. *Id.* ¶ 5-6.

In May 2011, the Nursing Board informed Andrea Nance that a pharmacy had reported Nance was writing excessive prescriptions for methadone. An investigator from the Nursing Board, Donna Mooney, met with Nance and reviewed records from Carolina Shores. Nance told Mooney that she believed the complaint to the Nursing Board was made by Sheriff Ingram or his agent; however, Mooney's report indicates Nance's case was initiated in response to a report from a doctor in Supply, Brunswick County, North Carolina. The doctor reported inappropriate prescribing by Nance, which he discovered after he began treating one of Nance's former patients. Mooney recommended Nance's licence be suspended for one year. In August 2012, Nance attended a hearing with the Nursing Board, at the conclusion of which the Nursing Board deferred suspension of Nance's license

4

for a period of one year conditioned upon compliance with a series of requirements. Compl. [DE-1-1] ¶¶ 35-36, 41, 43, 46; Defs' Mot., Ex. 1 [DE-24-1] at 10, 13; Defs.' Br. [DE-25] at 2.

The events that followed Sheriff Ingram's election, including the circumstances surrounding the Nursing Board's investigation, are for the most part in dispute. According to Plaintiffs, Sheriff Ingram launched an investigation through the Brunswick County Sheriff's Office ("BCSO") into Andrea Nance's prescribing practices at Carolina Shores and told BCSO employees to stop utilizing Carolina Shores for healthcare services. Decl. of Andrea Nance ("Nance Decl.") [DE-34] ¶¶ 4, 8. According to Defendants, neither Sheriff Ingram nor the BCSO investigated Nance, filed a complaint with the Nursing Board, or was aware of the Nursing Board's investigation of Nance prior to receiving the complaint in this matter. Ingram Aff. [DE-26] ¶¶ 8, 12, 17.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has met its burden, the nonmoving party then must affirmatively demonstrate, with specific evidence, that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*

5

at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor."  *Id.* at 255 (citation omitted); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005).  By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created" and judgment as a matter of law should be denied.  *Id.* at 489-90.

Where a non-moving party has been deposed and has submitted affidavit testimony in opposition to summary judgment, the Fourth Circuit has "consistently held that a party cannot create a triable issue in opposition to summary judgment simply by contradicting his deposition testimony with a subsequent affidavit." *Gell v. Town of Aulander*, 252 F.R.D. 297, 301-02 (E.D.N.C. 2008) (quoting *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999)).  The court may in fact strike or refuse to consider testimony "where a party by its behavior generates an issue of material fact through the production or manipulation of contradictory sworn testimony." *Id.* at

6

302 (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)). However, in the absence

of a direct conflict between versions of testimony or where the inconsistency is attributable to some

other reason than an "objectively discernable attempt to opportunistically create a genuine issue of

material fact," the testimony may be considered. *See id.* (attributing the vagueness and minor

inconsistencies between sworn testimony from 2002 about events occurring in 1995 and affidavit

testimony from 2007 to the passage of time); *see also Rodriguez v. Smithfield Packing Co.*, 545 F.

Supp. 2d 508, 514 (D. Md. 2008) (affidavits need not be stricken where there is no direct conflict

between versions of testimony).

## IV. DISCUSSION

**A.     42 U.S.C. § 1983**

Defendants contend they are entitled to summary judgment on Plaintiffs' claims under 42

U.S.C. § 1983 based on alleged violations of the Hatch Act, 5 U.S.C. § 1501 *et seq.*, and freedom

of speech, due process, and equal protection rights under the First, Fifth, and Fourteenth

Amendments. Defs.' Br. [DE-25] at 9-21. In response to Defendants' motion, Plaintiffs conceded

Charles Nance's § 1983 claims and Andrea Nance's § 1983 claim based on the Hatch Act. Pls.'

Resp. [DE-32] at 8-9. Plaintiffs also failed to respond to Defendants' argument regarding Andrea

Nance's Equal Protection claim and have produced no evidence in support of this claim, *id.* at 8-16,

which is thus considered abandoned. *See Feldman v. Law Enf't Assocs. Corp.*, 955 F. Supp. 2d 528,

536 (E.D.N.C. 2013) (finding plaintiff conceded that summary judgment was appropriate on claims

where he failed to respond to the arguments raised with respect to those claims in defendants'

memorandum in support of the motion for summary judgment). Accordingly, remaining for

7

consideration is Andrea Nance's § 1983 claim based on the alleged violation of her freedom of speech and due process rights under the First, Fifth, and Fourteenth Amendments.

Section 1983 imposes liability on anyone who, under the color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. However, section 1983 is not a "source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Lambert v. Williams*, 223 F.3d 257, 260 (4th Cir. 2000) (citations omitted). Thus, to state a cause of action under § 1983, a plaintiff must allege facts indicating a deprivation of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 49-50 (1988).

### i. First Amendment Retaliation Claim

The First Amendment protects the right to freedom of speech. U.S. Const. amend. I. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968); *ACLU v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993)). "However, not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." *Id.* (citing *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995)). "[A] § 1983 retaliation plaintiff must demonstrate that the defendant's actions had some adverse impact on the exercise of the plaintiff's constitutional rights." *Id.* (citing *Wicomico Cnty.*, 999 F.2d at 785). "The determination of whether government conduct or speech has a chilling effect or an

8

adverse impact is an objective one—we determine whether a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006). "A plaintiff seeking to assert a § 1983 claim on the ground that he experienced government retaliation for his First Amendment-protected speech must establish three elements: (1) his speech was protected, (2) the 'alleged retaliatory action adversely affected' his protected speech, and (3) a causal relationship between the protected speech and the retaliation." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (quoting *Suarez*, 202 F.3d at 685-86). Defendants concede that Plaintiffs' financial contribution to Daniels in the 2010 Republican primary for Brunswick County sheriff constitutes protected speech satisfying the first element. Defs.' Br. [DE-25] at 11-12. It is the second and third elements here that are in dispute.

To prove a First Amendment retaliation claim, "it is essential that plaintiffs demonstrate that they 'suffered some adversity in response to [the] exercise of protected rights.'" *Cottom v. Town of Seven Devils*, 30 F. App'x 230, 234 (4th Cir. 2002) (unpublished) (quoting *Wicomico Cnty.*, 999 F.2d at 785). "Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez*, 202 F.3d at 686. "The nature of the alleged retaliatory acts has particular significance where the public official's acts are in the form of speech." *Id.* at 687.

> Not only is there an interest in having public officials fulfill their duties, a public official's own First Amendment speech rights are implicated. Thus, where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory

action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory.

*Id.* (citations omitted).

With respect to the third and final element of causation, the Fourth Circuit has characterized this requirement as "rigorous." *Raub*, 785 F.3d at 885 (quoting *Huang v. Bd. of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990)). "[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action." *Id.* (quoting *Huang*, 902 F.2d at 1140). "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) (citation omitted). "'Knowledge alone, however, does not establish a causal connection' between the protected activity and the adverse action." *Id.* (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)). "There must also be some degree of temporal proximity to suggest a causal connection." *Id.* "A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two." *Id.* (citation omitted).

Here, Plaintiffs contend that Sheriff Ingram and the BCSO retaliated against Andrea Nance by investigating and reporting her to the Nursing Board, falsely accusing her of causing a large number of deaths in Brunswick County, and directing BCSO employees to stop utilizing Nance's services at Carolina Shores, resulting in a decline in her business. Pls.' Resp. [DE-32] at 9-14. Defendants contend there is no evidence of retaliation and, thus, no causal relationship between the

10

protected speech and any action of Sheriff Ingram; alternatively, Defendants argue Sheriff Ingram

is entitled to qualified immunity. Defs.' Br. [DE-25] at 12-13; 21-22.

### 1.  Investigation and Report to the Nursing Board

The Supreme Court has not definitively decided whether conducting a retaliatory

investigation is a constitutional tort. *Trueman v. United States*, No. 7:12-CV-73-F, 2015 WL

1456134, at \*13 (E.D.N.C. Mar. 30, 2015) (unpublished). The issue was noted, but not decided, in

*Hartman v. Moore*, 547 U.S. 250 (2006), a case involving a retaliatory prosecution. 547 U.S. at 262

n.9 ("No one here claims that simply conducting a retaliatory investigation with a view to promote

a prosecution is a constitutional tort. . . . Whether the expense or other adverse consequences of a

retaliatory investigation would ever justify recognizing such an investigation as a distinct

constitutional violation is not before us."). Likewise, it appears the Fourth Circuit has not squarely

addressed the issue of retaliatory investigation in the context of a First Amendment claim. *Trueman*,

2015 WL 1456134, at \*13. However, in explaining the adversity requirement in the *Suarez* case,

the Fourth Circuit cited favorably the holding in *Colson v. Grohman*, 174 F.3d 498 (5th Cir. 1999),

"that a citizen's First Amendment rights were not adversely affected because she had 'alleged only

that she was the victim of criticism, an investigation (or an attempt to start one), and false

accusations: all harms that, while they may chill speech, are not actionable under our First

Amendment retaliation jurisprudence[.]'" *Suarez*, 202 F.3d at 687 (quoting *Colson*, 174 F. 3d at

512). Other courts have declined to find, or expressed scepticism regarding the validity of, a

constitutional violation based on a retaliatory investigation. *Trueman*, 2015 WL 1456134, at \*13

(holding that "conducting a retaliatory investigation does not, in and of itself, form the basis of a

constitutional tort" and dismissing *Bivens* claim based on First Amendment retaliation) (citing

11

*Rehberg v. Paulk*, 611 F.3d 828, 850 n.24 (11th Cir. 2010) ("The initiation of a criminal investigation in and of itself does not implicate a federal constitutional right."); *Yazid-Mazin v. McCormick*, 2013 WL 5758716, at *4 n.5 (D.N.J. Oct. 24, 2013) (unpublished) ("Simply conducting a retaliatory investigation with a view to promote a prosecution does not state a claim under § 1983."); *Roark v. United States*, 2013 WL 1071778, at *5 (D. Or. Mar. 12, 2013) (questioning whether as a matter of law the plaintiff can plead a *Bivens* claim for a retaliatory criminal investigation and noting the holding of *Rehberg* that "a plaintiff cannot evince the existence of a constitutional tort based on a retaliatory investigation") (citing *Rehberg*, 611 F.3d at 850-51)).

As an initial matter, the undersigned tends to agree with Defendants that the actions of Sheriff Ingram and the BCSO do not rise the level of a criminal investigation sufficient to establish a constitutional violation. Sheriff Ingram stated in his affidavit that the BCSO did not investigate Nance or her clinic. Ingram Aff. [DE-26] ¶ 8. When Detective West was asked in his deposition whether he participated in an investigation of Nance, he responded that he would not call it an investigation, but would characterize his actions as "preliminary." West Dep. [DE-24-5] at 15-16. Detective West explained that he received information provided from various sources, including Assistant Coroner Crocker, regarding Nance's prescribing practices and then determined the appropriate course was to turn that information over to the Nursing Board for it to evaluate. *Id.* at 16-17, 32. It is undisputed that "no warrants were sought, no evidence was seized, and no charges were brought" against Nance. Ingram Aff. [DE-26] ¶ 8.

Viewed in the light most favorable to the non-movant Plaintiffs, the evidence demonstrates the only "investigative" actions taken with regard to Andrea Nance are the questioning of Ashli Daniels on April 19 and 20, 2011, after Daniels was arrested for forging prescriptions, and a single

12

inquiry to the SBI regarding Nance's prescription practices. With respect to Daniels, there is some dispute as to whether Detective West initially asked Daniels to cooperate in an investigation of Nance (i.e., request a prescription or pain medication from Nance) in exchange for assistance on Daniels' charges, Daniels Decl. [DE-33] ¶¶ 9-12; West Report [DE-32-3] at 2, or whether when asked if there was anyone Daniels could get pills from, Daniels first volunteered that she had received pills from Nance in the past when she was not a patient of Nance and then later was offered the opportunity to cooperate, West Dep. [DE-24-5] at 46-47. After Daniels initially agreed to cooperate, Sheriff Ingram also spoke with her regarding her potential cooperation. Ingram Aff. ¶ 10. However, Daniels later elected not to cooperate. Daniels Decl. [DE-33] ¶ 20; West Dep. [DE-24-5] at 51.

With respect to the SBI inquiry, Special Agent Mac Warner of the SBI stated he is aware of no request to the SBI by Sheriff Ingram or anyone in the BCSO to investigate Nance. Warner Aff. [DE-28] ¶ 6. Agent Warner did recall that a coroner or sheriff's detective inquired regarding Andrea Nance's prescription practices following a traffic accident involving multiple deaths in Brunswick County where the driver was in possession of drugs prescribed by Nance. Id. ¶ 7. Agent Warner requested the SBI's Diversion Unit review a statewide database for reporting controlled substances to see if there was anything out of the ordinary regarding Nance's prescribing practices and was informed nothing out of the ordinary was discovered. Id. ¶ 8.

This is the sum of Plaintiffs' evidence regarding the alleged investigation of Nance, which suggests Detective West explored investigating Nance, but ultimately opted not to do so. In fact, on April 27, 2011, approximately one week after the interview with Daniels, Detective West met with the Nursing Board investigator, turned over the information and report from Crocker, and

13

subsequently took no further action regarding Nance. Crocker Aff. [DE-27] ¶ 6; West Dep. [DE-24-5] at 15-18, 32. There is no evidence of any further investigatory action on the part of Sheriff Ingram or anyone else at the BCSO. The undersigned finds that the alleged actions of Ingram and the BCSO do not rise to the level of a criminal investigation sufficient to establish a constitutional violation.

To the extent the questioning of Daniels, a single inquiry to the SBI, and the report to the Nursing Board are considered a retaliatory investigation of constitutional magnitude, Plaintiffs cannot demonstrate that the "but for" cause of the either these actions was their protected speech. Agent Warner stated in his affidavit that the inquiry to the SBI, by either a coroner or sheriff's deputy, followed a multi-fatality traffic accident where the driver was in possession of drugs prescribed by Nance. Warner Aff. [DE-28] ¶ 7. The accident unquestionably provides an independent, non-retaliatory basis for an inquiry to the SBI regarding Nance's prescribing practices. *See Raub*, 785 F.3d at 885 (finding elements for First Amendment retaliation claim not satisfied where even assuming plaintiff's protected speech contributed to the alleged retaliatory decision, it was not dispositive where other facts contributed to defendant's action). Furthermore, Assistant Coroner Crocker, who responded to the multi-fatality accident occurring on March 8, 2011, also expressed concern to Detective West regarding Nance's prescribing practices after Crocker noticed six deaths in a little more than a year with a connection to Nance's prescriptions.[2] Crocker Aff. [DE-27] ¶¶ 4-6; West. Dep. [DE-24-5] 16-17. The concerns expressed by Crocker to Detective West

---

[2] Specifically, in addition to the multi-fatality accident described above where the driver had crushed Xanax in his pants pocket and his wife (a passenger in the vehicle along with their two sons, all killed in the accident) had a bottle of Xanax prescribed by Nance, these deaths include two suicides (one by overdose of prescription pills and one by gun shot wound), an overdose by prescription pills (unknown if suicide or accidental), and death by a medical condition where the decedent was taking prescription pills. Crocker Aff. ¶¶ 4-5. Crocker kept a log listing the calls he responded to from January 2008 to February 2011, and he noted four deaths (not including the accident victims) between late 2009 and early 2011 where the decedents had prescription pain medications obtained from Nance at Carolina Shores. *Id.* ¶ 5-6.

14

provide a further independent, non-retaliatory cause for any investigation or the report to the Nursing Board regarding Nance's prescribing practices. *See Raub*, 785 F.3d at 885 ("[I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action.") (quoting *Huang*, 902 F.2d at 1140).

Plaintiffs attempt to call into question the validity of Crocker's concerns and, thus, Detective West's decision to report Crocker's concerns to the Nursing Board without "further investigation." Pls.' Br. [DE-32] at 10-12. While somewhat ironic that Plaintiffs now complain the BCSO should have done more investigating, West's uncontradicted testimony is that, in conformity with his training, he turned the information provided by Crocker over to the Nursing Board for it to determine whether there was an issue with Nance's prescribing practices or not. West Dep. [DE-24-5] at 15-18, 32. There is no evidence that Detective West or Crocker had any further contact with the Nursing Board after the initial meeting or tried to influence the Nursing Board's investigation of Nance. *Id.* at 36; Crocker Aff. [DE-27] ¶ 6; *Kelly v. Chambers*, No. 07-C-1005, 2009 WL 765267, at *10 (N.D. Ill. Mar. 23, 2009) (unpublished) (finding elements for First Amendment retaliation claim were not satisfied where a police officer provided to the village board an allegedly false police report regarding the plaintiff, a village trustee, but allowed the board to perform its own investigation without any threat, coercion or suggestion of punishment). In fact, the Nursing Board investigation documents indicate that its investigation of Nance was initiated in response to a doctor's report to the Nursing Board regarding Nance's inappropriate prescribing and make no mention of the meeting between West, Crocker and the Nursing Board investigator or Crocker's report. Defs.' Mot., Ex. 1

15

[DE-24-1] at 10-15. The information received from Crocker is sufficient to provide an independent, non-retaliatory basis for any investigation and report to the Nursing Board.

Finally, the protected activity and alleged retaliatory actions lack the requisite temporal proximity to suggest a causal connection. Here, Plaintiffs allege in their verified complaint that Sheriff Ingram became aware of the Nances' financial contribution to Tim Daniels' campaign in April 2010. Compl. [DE-1-1] ¶ 17. However, the alleged retaliatory actions relating to the questioning of Ashli Daniels and the report to the Nursing Board did not occur until one year later in April 2011. *See Constantine*, 411 F.3d at 501 (finding four-month period between speech and conduct sufficient to satisfy causal connection, but noting that a nine-month lapse created a "very close question" as to causal connection) (citing *Price*, 380 F. 3d at 213); *Conley v. Town of Elkton*, 190 F. App'x 246, 253 n.4 (4th Cir. 2006) (unpublished) (noting, in the context of a First Amendment retaliation claim by a police officer that he was terminated in retaliation for protected speech, that events occurring one year and two years prior to his termination "are simply too far removed from his termination to raise a genuine issue of material fact concerning causation"). Although it is unclear precisely when the inquiry to the SBI by the coroner or sheriff's deputy was made, Special Agent Warner indicated it followed the multi-fatality accident, which occurred on March 8, 2011, within roughly the same time frame as the other alleged actions. Crocker Aff. [DE-27] ¶ 4; Warner Aff. [DE-28] ¶ 7. Thus, the timing of the SBI inquiry does not suggest a causal connection between the protected activity and the alleged retaliation. Accordingly, given the independent, non-retaliatory reasons the BCSO had to look into Nance's prescribing practices and to report Crocker's concerns to the Nursing Board, coupled with the lack of close temporal proximity

16

between the protected speech and the allegedly retaliatory conduct, Plaintiffs cannot show the requisite "but for" causation between the alleged retaliation and protected speech.

Alternatively, Sheriff Ingram is entitled to qualified immunity where the law with respect to a retaliatory investigation claim is not clearly established. "Generally, qualified immunity operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions." *Raub*, 785 F.3d at 880-81 (citation omitted). "The protection extends to all but the plainly incompetent or those who knowingly violate the law." *Id.* at 881 (citation & internal marks omitted). "Indeed, as we have emphasized repeatedly, [o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* "[Q]ualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Id.* (citation omitted). However, the court need not address both inquiries and can take them in "the order . . . that will best facilitate the fair and efficient disposition of each case." *Id.*

As explained above, neither the Supreme Court nor the Fourth Circuit has definitively determined whether an investigation can give rise to a First Amendment retaliation claim. *Trueman*, 2015 WL 1456134, at *13. However, other courts, including one in this district, have concluded that "conducting a retaliatory investigation does not, in and of itself, form the basis of a constitutional tort." *Id.* (citing *Rehberg*, 611 F.3d at 850 n.24; *Yazid-Mazin*, 2013 WL 5758716, at *4 n.5; *Roark*, 2013 WL 1071778, at *5). Accordingly, where the law with respect to retaliatory investigations is not clearly established, Sheriff Ingram is entitled to qualified immunity. *See Thompson v. Hall*, 426 F. App'x 855, 859 (11th Cir. 2011) (unpublished) (holding a sheriff and his deputy were entitled to

17

qualified immunity for plaintiffs' claim of retaliatory investigation where the "right to be free from a retaliatory investigation is not clearly established") (quoting *Rehberg*, 611 F.3d at 850-51); *Buckner v. Shumlin*, No. 1:12-CV-90-JGM, 2013 WL 6571814, at *6 (D. Vt. Dec. 13, 2013) (unpublished) (holding qualified immunity bars plaintiff's First Amendment retaliation claim because "the law with respect to retaliatory investigations is not clearly established.").

In sum, the alleged investigation and report to the Nursing Board provide no basis for a First Amendment retaliation claim against Sheriff Ingram.

### 2. Accusations Nance Caused a Number of Deaths in Brunswick County

Plaintiffs assert that Detective West and Sheriff Ingram both told Ashli Daniels that they could tie Andrea Nance to 66 deaths in Brunswick County. Daniels Decl. [DE-33] ¶¶ 11, 18. Plaintiffs argue that this statement, coupled with Detective West's statement to Daniels that they were "closing in" on Nance, *id.* ¶ 9, creates an inference that the BCSO intended to criminally prosecute Nance and intimates that punishment would follow. Pls.' Resp. [DE-32] at 12-13. Plaintiffs also contend the implication of Nance in numerous deaths resulted in a "marked decrease in her patient billings that can be explained by no other reason." *Id.* at 12. Detective West and Sheriff Ingram deny making these statements. Ingram Aff. [DE-26] ¶ 13, West. Dep. [DE-24-5] at 52-53.

As explained above, "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." *Suarez*, 202 F.3d at 687. "One possible exception to this rule is where the retaliatory disclosure of information 'relates to' those personal rights that can be

18

deemed 'fundamental' or 'implicit in the concept of ordered liberty.'; that is, the resulting injury caused by the disclosure of the information in retaliation for engaging in protected conduct is sufficiently embarrassing, humiliating, or emotionally distressful." *Id.* at 688 (citation & internal marks omitted). In *Suarez*, the Fourth Circuit did not address whether "a threat, coercion, or intimidation need be directed at the speaker or whether it can be directed at a third party," such as here where the statement was made to Daniels and not Nance. *Id.* at 690 n.17.

Assuming Detective West and Sheriff Ingram made the alleged statements, and that making them to Daniels would suffice, the statements do not threaten, coerce, or intimidate either Daniels or Nance with punishment, sanction, or adverse regulatory action. The accusation regarding Nance being linked to numerous deaths has no implicit or explicit threat of punishment, sanction, or adverse regulatory action. *See id.* at 689 (finding not actionable allegedly defamatory statements by attorney general and deputy attorney general to the media and other attorneys general that plaintiff "preys on the elderly, infirmed and incapacitated," "is a gambling syndicate from Ohio that also sells jewelry," that "representatives [of plaintiff] have 'a documented proclivity to violence,'" that plaintiff has "link[s] to organized crime," that plaintiff had "been sued by the United States Postal Service for mail fraud," that "it has been reported to [defendant] that in the course of the hearing . . . that [plaintiff's lawyer] threatened violence upon [a deputy attorney general]," and that "there is a possibility that [plaintiff's] *modus operandi* might include a proclivity to violence"). Furthermore, if a comment that law enforcement was "closing in" on a suspect is construed to intimate that imminent punishment, sanction, or adverse action will follow, it is likely that any number of similar comments routinely made in the course of law-enforcement's investigatory work would be rendered an actionable First Amendment retaliation claim. *See Ehrlich*, 437 F.3d at 416 ("[T]he Supreme

19

Court has condoned limiting retaliation liability when the challenged government action, whether conduct or speech, is so pervasive, mundane, and universal in government operations that allowing a plaintiff to proceed on his retaliation claim would 'plant the seed of a constitutional case' in 'virtually every' interchange. . . . [T]he retaliation cause of action must be administered to balance governmental and private interests so as not to impose liability in everyday, run-of-the-mill encounters.") (quoting *Connick v. Myers*, 461 U.S. 138, 148-49 (1983)).

Additionally, to the extent these statements are sufficient to establish the adverse action element, Plaintiffs cannot demonstrate their speech was the "but for" cause of the statements. As explained above, Detective West received information from Crocker that would justify any inquiry into Nance's prescribing practices, and as such the statements to Daniels were made as part of a legitimate law-enforcement inquiry. Further, these statements made one year after Sheriff Ingram learned of Plaintiffs' protected speech also lack the close temporal proximity indicative of a causal connection. *See Conley*, 190 F. App'x at 253 n.4; *Price*, 380 F. 3d at 213. Finally, Plaintiffs' contention that these statements led to a marked decrease in her patient billings is speculative at best. Plaintiffs have presented no evidence from any former patient supporting this theory, and "[m]ere speculation by the non-moving party cannot create a genuine issue of material fact." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Accordingly, Detective West's and Sheriff Ingram's statements to Daniels provide no basis for a First Amendment retaliation claim.

### 3. Direction to BCSO Employees Not to Utilize Carolina Shores

Plaintiffs contend that Sheriff Ingram retaliated against them for their protected speech by prohibiting employees of the BCSO and their families from utilizing Nance and Carolina Shores for

healthcare services. Plaintiff states that she learned of Sheriff Ingram's directive from Kyle Jones, a former deputy with the BCSO, who died unexpectedly in January of 2013. Nance Decl. [DE-34] ¶ 4; Pls.' Resp. [DE-32] at 4 n.6. Prior to learning of Sheriff Ingram's alleged statement from Jones, Nance noticed that BCSO employees had stopped visiting Carolina Shoes, and prior to that time Carolina Shores provided services to between 20 and 30 BCSO employees or their family members monthly. Nance Decl. [DE-34] ¶¶ 5-7. Nance's total billings went from approximately $469,000.00 in 2010 to $222,000.00 in 2011. *Id.* ¶ 12. Sheriff Ingram denies giving such a directive. Ingram Aff. [DE-26] ¶ 15.

The only evidence presented by Plaintiffs in support of this claim is Nance's statement that Jones told her of Sheriff Ingram's directive and Nance's subsequent decline in business. Jones's statement, as recounted by Nance, is inadmissible hearsay. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). While there are hearsay exceptions when the declarant is "unavailable as a witness," none of those exceptions applies under the present circumstances. *See* Fed. R. Evid. 804(b) ("The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:" (1) Former Testimony; (2) Statement Under the Belief of Imminent Death; (3) Statement Against Interest; (4) Statement of Personal or Family History; (5) Other Exceptions (Rule 807's Residual Exception); and (6) Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability). Likewise, the residual exception does not apply because Plaintiffs could obtain such evidence through reasonable efforts from one of the several other former patients who allegedly left

21

Nance's practice due to Sheriff Ingram's directive.[3] *See* Fed. R. Evid. 807 (providing a residual exception to the exclusion of a hearsay statement if "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice."). "[H]earsay statements, which would be inadmissible, do not meet Rule 56's standards." *Cottom*, 30 F. App'x at 234; Fed. R. Civ. P. 56(c)(4). Absent the hearsay statement of Jones, Nance's attribution of asserted loss of business to Sheriff Ingram's directive is merely speculative and insufficient to create a genuine dispute in light of Sheriff Ingram's denial. Accordingly, Sheriff Ingram's alleged directive provides no basis for a First Amendment retaliation claim.

### ii. Fifth and Fourteenth Amendment Due Process Claim

Plaintiffs contend that Sheriff Ingram's statement accusing Andrea Nance of prescribing practices that contributed to the death of patients and his directive to BCSO employees to stop utilizing Nance for healthcare services damaged her business and deprived her of the right to contract with BCSO employees in violation of her due process rights. Pls.' Resp. [DE-32] at 14-16. Defendants contend Plaintiffs cannot establish a due process claim because there were no public statements made regarding Andrea Nance and she suffered no deprivation of a legal right or status. Defs.' Br. [DE-25] at 13-19; Defs.' Reply [DE-35] at 6-8.

---

[3] Plaintiffs assert that they intentionally did not identify any BCSO employees that previously utilized Carolina Shores because such a disclosure would violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Pls.' Resp. [DE-32] at 20 n.12. HIPAA privacy concerns are routinely addressed by the entry of a protective order and do not justify Plaintiffs' failure to produce admissible evidence in support of their claims.

22

To establish a procedural due process claim, plaintiffs must demonstrate: "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (quoting *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011)). In cases involving allegedly defamatory statements by the government, plaintiffs must demonstrate "more than reputational injury in order to prevail on a constitutional claim." *Id.* at 314-15. This requirement serves to prevent plaintiffs from "constitutionaliz[ing] state tort claims through artful pleading." *Id.* at 314 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Daniels v. Williams*, 474 U.S. 327, 332 (1986)). "[A] plaintiff must demonstrate that his reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status if he wants to succeed." *Id.* at 315 (quoting *Paul*, 424 U.S. at 711).

Here, Plaintiffs argue that requisite change in legal status was Nance's loss of the ability to contract with BCSO employees and their families as a result of the alleged defamatory statement by Ingram. Pls.' Resp. [DE-32] at 16. Plaintiffs' theory is fundamentally flawed where Nance's "contracts" were with private individuals who happened to be government employees or family members thereof, and Nance was not employed by and had no contract with the Sheriff, the BCSO, or any other governmental entity. The Fourth Circuit has rejected a procedural due process claim under similar circumstances where the alleged deprivation was private in nature. In *Shirvinski*, a consultant to a subcontractor working on a United States Coast Guard ("Coast Guard") project brought a procedural due process claim against the Coast Guard. 673 F.3d at 312-13. The plaintiff's at-will consulting agreement was terminated after the Coast Guard complained to the main contractor regarding plaintiff's performance, resulting in the main contractor directing the subcontractor to

23

terminate the plaintiff's contract. *Id.* The Fourth Circuit determined that the plaintiff had failed to demonstrate the requisite altered legal status in addition to reputational injury. *Id.* at 314-15. The Fourth Circuit acknowledged that it had previously "recognized that a loss of government employment accompanied by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest," but declined to expand the public employment line of cases to find a constitutional deprivation where the plaintiff "was neither an employee of nor in a direct contractual relationship with the [government]." *Id.* at 315 (citing *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006)). Despite the fact that the government's action "may have affected [the plaintiff's] *private* employment prospects with [government contractors,] . . . unlike the loss of a government job, that injury does not work a change in legal status." *Id.* at 314 (citing *Paul*, 424 U.S. at 694-97, 706); *see also Sheu v. Detroit 90/90*, No. 14-CV-14177, 2015 WL 2124624, at *12 (E.D. Mich. May 6, 2015) (unpublished) (dismissing procedural due process claim where "[a]s a private employee, [plaintiff] is 'not due any of the additional federal due process rights'") (quoting *Branham v. Thomas M. Cooley Law School*, 689 F.3d 558 (6th Cir. 2012)); *Nadeau v. Nye*, 934 F. Supp. 2d 932, 938-40 (N.D. Ohio 2013) (concluding plaintiff tow truck driver suffered no deprivation of a constitutionally protected liberty or property interest based on allegations that the sheriff informed plaintiff's employer that the sheriff would have plaintiff arrested if plaintiff responded to a call for service through the sheriff's department). Here, to the extent Nance can be said to have a contractual relationship with her patients, these "contracts" are between private individuals; thus, Nance cannot demonstrate a constitutionally protected liberty interest.

Furthermore, any decision by BCSO employees and their families to stop utilizing Carolina Shores was ultimately the individual's decision. "The government 'normally can be held responsible

24

for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Shirvinski*, 673 F.3d at 317-18 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). As discussed above, Plaintiffs have presented no admissible evidence that Sheriff Ingram directed his employees not to utilize Nance and Carolina Shores for healthcare services. The *Shirvinski* court also noted that the plaintiff had not shown his "skills were . . . rendered largely unmarketable as a result of the agency's acts." *Id.* at 316 (citing *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995)). Similarly, here, Nance has not shown that she was largely unable to sustain her medical practice in the wake of the alleged directive by Sheriff Ingram. While Nance asserted that her billings fell from $469,984.99 in 2010 to $222,336.22 in 2011, she continued to operate Carolina Shores and her billings subsequently rose to $374,867.14 in 2012 and to $387,358.44 in 2013. Nance Decl. [DE-34] ¶ 12. Accordingly, Plaintiffs have failed to demonstrate the requisite change in legal status to establish a procedural due process claim based on Sheriff Ingram's allegedly defamatory statements.

In sum, the undisputed facts fail to demonstrate Sheriff Ingram violated Andrea Nance's constitutional right to freedom of speech or due process.[4] Accordingly, Sheriff Ingram is entitled to summary judgment on Nance's § 1983 claims.

### iii.    Official Capacity § 1983 Claims Against Sheriff Ingram

A plaintiff's claim against a government official in his official capacity is treated as a claim against the government entity of which the official is an agent. *See Kentucky v. Graham*, 473 U.S.

---

[4] Having found no constitutional violation, the Defendants' alternative argument that Sheriff Ingram is entitled to qualified immunity need not be addressed.

159, 165 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). To establish liability against the entity, a plaintiff must show that the alleged deprivation was the result of municipal policy or custom. *See Jones v. Houston*, No. 4:08-CV-121-F, 2010 WL 3835147, at *8 (E.D.N.C. Sept. 28, 2010) (unpublished) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). "A policy or custom for which a local government entity may be held liable may arise in four ways: (1) through an express policy, such as written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). An official capacity claim "fails as a matter of law where there is no underlying constitutional violation." *Russ v. Causey*, 732 F. Supp. 2d 589, 604 (E.D.N.C. 2010) (citing *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420-21 (4th Cir. 1996)). Here, as discussed above, Plaintiffs have failed to demonstrate they suffered a constitutional violation. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' official capacity § 1983 claims.

## B.     State Law Claims

Plaintiffs asserted state law claims of defamation and slander *per se*, tortious interference with prospective economic advantage, intentional infliction of emotional distress, and negligent infliction of emotional distress, as well as a claim on the sheriff's bond. Compl. [DE-1-1] ¶¶ 83-112. Defendants contend Plaintiffs cannot establish the elements of these claims and, alternatively, the claims are barred by governmental and public officer's immunity. Defs.' Br. [DE-25] at 22-30. In

26

response to Defendants' motion for summary judgment, Plaintiffs concede their defamation and slander *per se* claims are barred by the statute of limitations and that they have failed to meet their burden of establishing the requisite severe emotional distress to sustain claims for negligent and intentional infliction of emotional distress. Pls.' Resp. [DE-32] at 19-20. Thus, remaining for consideration are Plaintiffs' tortious interference with prospective economic advantage and sheriff's bond claims.

### i. Tortious Interference with Prospective Economic Advantage

In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show, "1) a valid contract would have existed between plaintiff and a third party but for defendant's conduct; 2) defendant maliciously induced the third party to not enter into the contract; and 3) defendant thereby proximately caused plaintiff to suffer actual damages." *SAS Inst. Inc. v. World Programming Ltd.*, 64 F. Supp. 3d 755, 780 (E.D.N.C. 2014) (citing *Cobra Capital, LLC v. RF Nitro Commc'ns, Inc.*, 266 F. Supp. 2d 432, 439 (M.D.N.C. 2003) (citing *Spartan Equip. Co. v. Air Placement Equip. Co.*, 263 N.C. 549, 559, 140 S.E.2d 3 (1965))). "A plaintiff must further show that the defendant acted 'for a reason not reasonably related to the protection of a legitimate business interest.'" *Id.* (quoting *Cobra Capital*, 266 F. Supp. 2d at 439 (citation omitted)).

As discussed above, the hearsay statement that Sheriff Ingram directed BCSO employees and their families not to utilize Nance and Carolina Shores for their healthcare is inadmissible and may not be used defeat summary judgment. *See supra* section IV.A.i.3. Furthermore, Nance's asserted loss of business alone, which she attributes to Sheriff Ingram's directive, is merely speculative and insufficient to create a genuine dispute in light of Sheriff Ingram's denial. *Id.* Plaintiffs, therefore, cannot establish that Sheriff Ingram maliciously induced BCSO employees and their families to

27

refrain from utilizing Nance and Carolina Shores, and their tortious interference claim fails on the second element. Accordingly, Defendants are entitled to summary judgment on this claim against Sheriff Ingram in both his individual and official capacities.

### ii.    Sheriff's Bond

Plaintiffs named Western Surety Company as a Defendant in this action and as the surety on Sheriff Ingram's official sheriff's bond pursuant to North Carolina General Statute § 58-76-5. Compl. [DE-1-1] ¶ 7. Defendants contend Plaintiffs did not assert a claim on the bond and, to the extent they did, such claim fails where there is no liability on the underlying tort claims against Sheriff Ingram. Defs.' Br. [DE-25] at 29-30.

"North Carolina courts have recognized that the bond action is in place to allow a claim where common law torts would otherwise be precluded because of immunity." *Elliott v. Rollins*, No. 5:11-CV-693-FL, 2013 WL 5460193, at *2 (E.D.N.C. Sept. 30, 2013) (unpublished) (citing *Slade v. Vernon*, 110 N.C. App. 422, 429 S.E.2d 744, 746 (1993)). However, where the "plaintiff does not survive summary judgment on a common law tort claim, it follows that plaintiff's statutory bond claim must also fail." *Id.*; *Stafford v. Barker*, 129 N.C. App. 576, 585, 502 S.E.2d 1, 6 (1998) (affirming grant of summary judgment where there was no common law claim to support plaintiff's statutory bond claim). Here, Plaintiffs have either conceded or failed to produce sufficient evidence in support of their common law tort claims. Accordingly, Defendants are entitled to summary judgment on the bond claim.

### V.  CONCLUSION

Fore the reasons stated herein, it is RECOMMENDED that Defendants' motion for summary judgment [DE-24] be ALLOWED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on the respective parties or, if represented, their counsel. Each party shall have until **August 21, 2015** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.,* 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins,* **766 F.2d 841, 846-47 (4th Cir. 1985).**

Any response to objections shall be filed within 14 days of the filing of the objections.

SUBMITTED, the 7th day of August 2015.

_____
Robert B. Jones, Jr.
United States Magistrate Judge