IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:14-CV-9-FL

| | | |
|---|---|---|
| CHARLES NANCE, ANDREA NANCE, CAROLINA SHORES HEALTHCARE, PLLC, and *all those similarly situated*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| JOHN INGRAM, *in his individual and official capacity as Sheriff of Brunswick County*, and WESTERN SURETY COMPANY, | ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion for summary judgment, (DE 24), made pursuant to Federal Rule of Civil Procedure 56. Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), United States Magistrate Judge Robert B. Jones, Jr., entered a memorandum and recommendation ("M&R"), (DE 36), wherein it is recommended that defendants' motion be granted. Plaintiffs timely filed objections to the M&R, and defendants have responded. In this posture, the issues raised are ripe for ruling. For the reasons stated below, the court adopts the recommendation of the magistrate judge as its own and grants defendants' motion for summary judgment.

**STATEMENT OF THE CASE**

On January 13, 2014, plaintiffs initiated this action in the Brunswick County, North Carolina,

Superior Court, stating a claim under 42 U.S.C. § 1983 for alleged violations of the Hatch Act, 5 U.S.C. § 1501 et seq.; claims according to their right to freedom of speech, due process, and equal protection under the First, Fifth, and Fourteenth Amendments; and state law claims of defamation and slander per se, tortious interference with prospective economic advantage, intentional infliction of emotional distress, and negligent infliction of emotional distress for which plaintiffs sought compensatory and punitive damages. Plaintiffs since have conceded some claims in response to defendants' summary judgment motion. (Pls.' Resp., DE 32 at 8 9). Plaintiffs have not pursued claims or sought class certification on behalf of those plaintiffs named "All Those Similarly Situated." (Id. at 8 20). Also, plaintiffs have abandoned all claims by plaintiff Charles Nance, and accordingly this order addresses the remaining claims of plaintiff Andrea Nance and plaintiff Carolina Shores Healthcare, PLLC ("Carolina Shores") (collectively "plaintiffs"). Plaintiffs allege defendant John Ingram, the Sheriff of Brunswick County, North Carolina, violated plaintiff Nance's civil rights and interfered with plaintiff Nance's healthcare business, plaintiff Carolina Shores, after plaintiff Nance supported a candidate opposing defendant Ingram in the primary election for Brunswick County Sheriff. (Compl., DE 1-1).

Defendants removed this action to this court pursuant to 28 U.S.C. § 1441. (DE 1). On December 19, 2014, defendants moved for summary judgment based on arguments that plaintiffs failed to produce sufficient evidence to meet all elements of their claims and that defendants enjoyed qualified immunity. (DE 24). Plaintiffs responded and defendants replied to those arguments, (DE 32, 35), and M&R was entered on August 7, 2015, (DE 36). The magistrate judge recommends defendants' motion for summary judgment be granted because plaintiffs failed to show a § 1983 violation, especially where some facts were inadmissible, and related state law claims should fail for

relying on the same facts. On August 21, 2015, plaintiffs filed objections, and on September 3, 2015, defendants responded.

## STATEMENT OF THE FACTS

The court herein adopts by reference the facts as recited in the magistrate judge's M&R:

The Nances are a married couple and have lived in Brunswick County, North Carolina for approximately 16 years. Charles Nance has been an officer with the North Carolina Highway Patrol for 20 years, and Andrea Nance has been a nurse practitioner for ten years, operating Carolina Shores since March 2005. In 2010, the Nances made a financial contribution to the campaign of Tim Daniels who was running against Sheriff Ingram in the 2010 Republican primary for Brunswick County sheriff. Sheriff Ingram had been initially appointed in May 2008 and ran as the incumbent in 2010. Daniels lost the primary, and Sheriff Ingram was elected in November 2010. (Compl., DE 1-1 ¶¶ 10 13, 15 16, 18; Defs.' Br., DE 25 at 2; Ingram Aff., DE 26 ¶ 1).

In April 2011, Ashli Daniels (at that time the wife of Tim Daniels) was arrested for forging prescriptions. (Basily Decl., DE 33 ¶¶ 6 7). Daniels had been a patient of Andrea Nance at Carolina Shores. (*Id.* ¶ 13). On April 19, 2011, Daniels spoke with Detective Israel West and Agent Joe Cherry of the Brunswick County Sheriff's Office ("BCSO") and Agent Kelly Eason of the North Carolina State Bureau of Investigation ("SBI"). (*Id.* ¶ 5). It is disputed whether Detective West initially asked Daniels to cooperate in an investigation of Nance (i.e., request a prescription or pain medication from Nance) in exchange for assistance on Daniels' charges, (*id.* ¶¶ 9 12), or whether when asked if there was anyone Daniels could get pills from, Daniels volunteered that she had received pills from Nance in the past when she was not a patient of Nance, (West Dep., DE 24-5 at 46 47). In any event, Daniels initially agreed to cooperate, but then later elected not to do so.

3

(Daniels Decl., DE 33 ¶¶ 13, 20; West Dep., DE 24-5 at 51).

In March or April of 2011, Brunswick County Assistant Coroner David Crocker, who is also a part-time Deputy Sheriff in Brunswick County, initiated a meeting with Detective West and Agent Cherry after Crocker found six deaths in a little more than a year with a connection to Nance's prescriptions and became concerned. (Crocker Aff., DE 27 ¶¶ 4 6). Around this same time, Special Agent Mac Warner of the SBI received an inquiry from a coroner or sheriff's detective regarding Andrea Nance's prescription practices following a traffic accident involving multiple deaths in Brunswick County where the driver was in possession of drugs prescribed by Nance. (Warner Aff., DE 28 ¶ 7). Agent Warner requested the SBI's Diversion Unit review a statewide database for reporting controlled substances to see if there was anything out of the ordinary regarding Nance's prescribing practices and was informed nothing out of the ordinary was discovered. (*Id.* ¶ 8). On April 27, 2011, Detective West, Agent Cherry, and Crocker met with David Allen, an investigator from the North Carolina Board of Nursing (the "Nursing Board"), regarding Andrea Nance. (Crocker Aff. ¶ 6). Crocker provided the investigator with a copy of a log prepared by Crocker containing calls he responded to from January 2008 to February 2011, noting four deaths (not including the deaths from the traffic accident) between late 2009 and early 2011 where the victims were using prescription pain medications obtained from Nance at Carolina Shores. (*Id.* ¶ 5 6).

In May 2011, the Nursing Board informed Andrea Nance that a pharmacy had reported Nance was writing excessive prescriptions for methadone. An investigator from the Nursing Board, Donna Mooney, met with Nance and reviewed records from Carolina Shores. Nance told Mooney that she believed the complaint to the Nursing Board was made by Sheriff Ingram or his agent; however, Mooney's report indicates Nance's case was initiated in response to a report from a doctor in Supply,

4

Brunswick County, North Carolina. The doctor reported inappropriate prescribing by Nance, which he discovered after he began treating one of Nance's former patients. Mooney recommended Nance's licence be suspended for one year. In August 2012, Nance attended a hearing with the Nursing Board, at the conclusion of which the Nursing Board deferred suspension of Nance's license for a period of one year conditioned upon compliance with a series of requirements. (Compl., DE 1-1 ¶¶ 35 36, 41, 43, 46; Defs' Mot., DE 24-1 at 10, 13; Defs.' Br., DE 25 at 2).

The events that followed Sheriff Ingram's election, including the circumstances surrounding the Nursing Board's investigation, are for the most part in dispute. According to Plaintiffs, Sheriff Ingram launched an investigation through the BCSO into Andrea Nance's prescribing practices at Carolina Shores and told BCSO employees to stop utilizing Carolina Shores for healthcare services. (Nance Decl., DE 34 ¶¶ 4, 8). According to Defendants, neither Sheriff Ingram nor the BCSO investigated Nance, filed a complaint with the Nursing Board, or was aware of the Nursing Board's investigation of Nance prior to receiving the complaint in this matter. (Ingram Aff., DE 26 ¶¶ 8, 12, 17).

**COURT'S DISCUSSION**

A.     Standard of Review

The district court reviews <u>de novo</u> those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. <u>Diamond v. Colonial Life & Acc. Ins. Co.</u>, 416 F.3d 310, 315 (4th Cir. 2005); <u>Camby v. Davis</u>, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28

5

U.S.C. § 636(b)(1).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the nonmoving party then must affirmatively demonstrate, with specific evidence, that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see also United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when

"the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.   Objections to the M&R

Plaintiffs object to the M&R on five grounds. Plaintiffs contend they presented sufficient evidence to raise genuine issues of material fact with regards to: 1) whether defendant Ingram's investigatory actions chilled plaintiffs' speech, in violation of § 1983, and, alternatively, whether legitimate non-retaliatory concerns supported defendant Ingram's investigatory actions; 2) whether plaintiffs' own statement, recounting a statement made by a now-deceased deputy sheriff is admissible under Rule 807 of the Federal Rules of Evidence; 3) whether defendant Ingram's preliminary investigatory actions were considered as a single act; 4) whether defendant Ingram is entitled to qualified immunity; and 5) whether plaintiffs' state law claim of tortious interference with prospective economic advantage fails to satisfy two elements, and whether their other state law claims against the sheriff's bond and against defendant Ingram in his individual capacity should fail as a matter of law. (Pls.' Obj.).

1.   § 1983 Claim

Plaintiffs contributed money to a political opponent of defendant Ingram's, and plaintiffs allege the donation caused defendant Ingram to initiate a retaliatory investigation that harmed them. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000); ACLU v. Wicomico Cnty., Md., 999 F.2d 780,

785 (4th Cir. 1993). "However, not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." Id. "[A] § 1983 retaliation plaintiff must demonstrate that the defendant's actions had some adverse impact on the exercise of the plaintiff's constitutional rights." Id. "A plaintiff seeking to assert a § 1983 claim on the ground that he experienced government retaliation for his First Amendment-protected speech must establish three elements: (1) his speech was protected, (2) the 'alleged retaliatory action adversely affected' his protected speech, and (3) a causal relationship between the protected speech and the retaliation." Raub v. Compbell, 785 F.3d 876, 885 (4th Cir. 2015) (quoting Suarez, 202 F.3d at 685 86).

As an initial matter, the Fourth Circuit has not definitively addressed whether retaliatory investigations are constitutional violations in the context of First Amendment claims, see Trueman v. United States, No. 7:12-CV-73-F, 2015 WL 1456134, at *13 (E.D.N.C. Mar. 30, 2015) aff'd, 2015 WL 5092616 (4th Cir. Aug. 31, 2015), although it has noted with approval the holding in Colson v. Grohman, 174 F.3d 498 (5th Cir. 1999), "that a citizen's First Amendment rights were not adversely affected because she had 'alleged only that she was the victim of criticism, an investigation (or an attempt to start one), and false accusations: all harms that, while they may chill speech, are not actionable under our First Amendment retaliation jurisprudence[.]'" Suarez, 202 F.3d at 687 (quoting Colson, 174 F.3d at 512). Other courts also have declined to find a constitutional violation based on a retaliatory investigation. See Trueman, 2015 WL 1456134, at *13 (citing Rehberg v. Paulk, 611 F.3d 828, 850 n.24 (11th Cir. 2010); Yazid-Mazin v. McCormick, 2013 WL 5758716, at *4 n.5 (D.N.J. Oct. 24, 2013) (unpublished); Roark v. United States, 2013 WL 1071778, at *5 (D. Or. Mar. 12, 2013)). Upon review of these cases, this court held that retaliatory investigations do not constitute a constitutional tort. Trueman, 2015 WL 1456134, at *13 ("No one here claims that

8

simply conducting a retaliatory investigation with a view to promote a prosecution is a constitutional tort. . . . Whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us.").

In any event, plaintiffs' retaliation claim also fails on the merits, as plaintiffs have forecast insufficient evidence to establish a prima facie case. It is undisputed that plaintiffs' financial contribution to the political campaign of defendant Ingram's opponent constituted protected speech. (Defs.' Br., DE 25 at 11 12). However, plaintiffs cannot satisfy the second and third elements of their § 1983 claim. In regard to the second element, "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." Suarez, 202 F.3d at 687. With respect to the third element relating to causation, "it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action." Huang v. Bd. of Governors of Univ. of N. Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990). "'Knowledge alone . . . does not establish a causal connection' between the protected activity and the adverse action." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005) (quoting Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004)).

There is insufficient evidence of a retaliatory investigation to establish plaintiffs' § 1983 claim. Plaintiffs argue that defendant Ingram retaliated against their political donation by investigating and reporting plaintiffs to the North Carolina Nursing Board ("NCNB"), accusing plaintiffs of causing a number of deaths in Brunswick County, and directing Brunswick County

9

Sheriff's Office ("BCSO") employees to stop utilizing plaintiffs' healthcare services. (Pls.' Resp, DE 32 at 9 14). However, "no warrants were sought, no evidence was seized, and no charges were brought" by defendant Ingram against plaintiffs. (Ingram Aff DE 26 ¶ 8). Taken together, the evidence shows that defendant Ingram and the BCSO considered investigating plaintiffs' prescribing practices but decided not to do so. Instead, the BCSO conveyed its concerns to the NCNB and then took no further action. (West Dep, DE 24 at 15 18, 32). This conduct does not rise to the level of a criminal investigation because it reflected only preliminary steps.

In addition, plaintiffs fail to satisfy the causation element because defendant Ingram and his staff acted on the basis of a legitimate, non-retaliatory cause for concern. A coroner noticed and reported six deaths connected to plaintiff's prescriptions, and this report followed a multi-fatality traffic accident in which the driver and his passenger possessed drugs prescribed by plaintiffs. (Warner Aff., DE 28 ¶ 7). Plaintiffs argue that these incidents did not provide sufficient independent cause for defendant Ingram and the BCSO to refer plaintiffs to the NCNB. However, the procedures followed conform to BCSO training, and there is no evidence that defendant Ingram or any other member of the BCSO had any further contact with the NCNB regarding its investigation of plaintiffs. (West Dep., DE 24 at 15 18, 32, 36; Crocker Aff., DE 27 ¶ 6). Indeed, the NCNB already had opened an investigation into plaintiffs in response to a doctor's report regarding prescription practices. (Defs.' Mot., Ex. 1, DE 24, at 10 15). The multi-fatality accident and the coroner's report provided a sufficient non-retaliatory basis for the BCSO to make preliminary inquiries and to refer the issue to the NCNB. See Raub, 785 F.3d at 885 (finding elements for First Amendment retaliation claim not satisfied where even assuming plaintiff's protected speech contributed to the

alleged retaliatory decision, it was not dispositive where other facts contributed to defendant's action).

Plaintiffs' claim fails as a matter of law even if there had been no independent, non-retaliatory justification for defendant Ingram's actions. For this reason, and for plaintiffs' insufficient showing of the elements of retaliation and causation, plaintiffs' § 1983 claim fails.

2. Admissibility of Directive Not to Use Plaintiffs' Healthcare Services

Through their own statement, plaintiffs seek to admit a statement made by a now-deceased deputy sheriff. Rule 802 of the Federal Rules of Evidence prohibits the admission of hearsay, defined as an out of court statement offered for the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). There are a number of exceptions to this rule, including the residual exception provided by Rule 807: "Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay[:] . . . (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interest of justice." Fed. R. Evid. 807(a). However, statements should be admitted under Rule 807 only rarely. "Admission of evidence pursuant to this rule is to be used in exceptional circumstances." Bouygues Telecom, S.A. v. Tekelec, 473 F. Supp. 2d 692, 696 (E.D.N.C. 2007).

Plaintiffs state that one member of the BCSO informed plaintiff Nance that during a department meeting defendant Ingram directed his employees to stop utilizing plaintiffs' healthcare services. (Nance Decl., DE 34 ¶ 4; Pls.' Resp., DE 32 at 4 n.6). Recitation of this statement in plaintiff Nance's affidavit does not satisfy the third element of the residual hearsay exception.

11

Plaintiffs object that this evidence is most probative and that finding another witness of defendant Ingram's statement would be unreasonably difficult. Pls.' Obj. (DE 37) at 7. However, there are a number of other witnesses from whom plaintiffs could obtain similar evidence with reasonable efforts. For example, plaintiffs could have deposed or sought affidavits from other attendees of the BCSO department meeting or from any one of the former patients who allegedly left plaintiffs' healthcare practice due to defendant Ingram's directive. Instead, plaintiffs have relied upon a statement from a person who is now deceased in order to introduce evidence of a statement which defendant Ingram denies making. (Ingram Aff. ¶ 15). Therefore, plaintiffs' hearsay statement of defendant Ingram's directive remains inadmissible and provides no basis for plaintiffs' § 1983 claim.

3. Defendant Ingram's Conduct as a Single Act

"The determination of whether government conduct or speech has a chilling effect or an adverse impact is an objective one    we determine whether a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." The Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 416 (4th Cir. 2006). Furthermore, "[d]etermining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Suarez, 202 F.3d at 686.

Plaintiffs argue that the preliminary investigation, referral, and directive must not be considered as individual events but instead be considered as a single action in order to assess their total impact on plaintiffs. (Pl Obj, DE 37 at 9, 11). This court has considered the actions as a whole,

and for the reasons described in Section B.1., it holds that these events are insufficient to support plaintiffs' § 1983 claim.

 4. Qualified Immunity

Law enforcement officials enjoy qualified immunity unless they violate a "clearly established" right, and the "'right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Owens v. Baltimore City State's Attorney's Office, 767 F.3d 379, 407 (4th Cir. 2014) (Traxler, C.J., concurring and dissenting in part) (quoting Reichle v. Howards, 132 S.Ct. 2088, 2093 (2012)). Thus, "qualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." Raub, 785 F.3d at 881.

Defendant Ingram is entitled to qualified immunity under both prongs of analysis. As explained above, plaintiff's § 1983 allegations do not rise to the level of violating a constitutional right and therefore do not trigger the first prong. Second, there is no clearly established right not to be the subject of a retaliatory investigation. See Trueman, 2015 WL 1456134, at *13. Therefore, even if defendant Ingram's conduct rose to the level of an investigation it would not have violated § 1983. As a result, defendant Ingram is entitled to qualified immunity.

 5. State Law Claims

In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show, "1) a valid contract would have existed between plaintiff and a third party but for defendant's conduct; 2) defendant maliciously induced the third party to not enter into the contract; and 3) defendant thereby proximately caused plaintiff to suffer actual damages." SAS Inst.

13

Inc. v. World Programming Ltd., 64 F. Supp. 3d 755, 780 (E.D.N.C. 2014); Spartan Equip. Co. V. Air Placement Equip. Co., 263 N.C. 549, 559 (1965). Plaintiffs fail to meet the malice element because plaintiff Nance's hearsay statement regarding defendant Ingram's directive against using plaintiffs' healthcare services is inadmissible. See supra section B.2. In any event, plaintiffs also fail to satisfy the proximate cause element because their loss of business more than likely resulted from any number of causes, and without plaintiffs' hearsay statement regarding defendant Ingram's directive this claim merely is speculative and insufficient to create a genuine dispute in light of defendant Ingram's denial of this statement. Therefore, plaintiffs fail to establish that defendant Ingram maliciously induced other members of the BCSO to stop using plaintiffs' healthcare service.

Sheriff bond actions "allow a claim where common law torts would otherwise be precluded because of immunity." Elliot v. Rollins, No. 5:11-CV-693-FL, 2013 WL 5460193, at * 2 (E.D.N.C. Sept. 30, 2013) (citing Slade v. Vernon, 110 N.C. App. 422 (1993)). However, where "plaintiff does not survive summary judgment on a common law tort claim, it follows that plaintiff's statutory bond claim must also fail." Id. For the reasons described above, plaintiffs have failed to produce evidence sufficient to support a tort claim. Therefore, plaintiffs' claim against the sheriff's bond must fail.

Finally, an official capacity claim "fails as a matter of law where there is no underlying constitutional violation." Russ v. Causey, 732 F. Supp. 2d 589, 604 (E.D.N.C. 2010) (citing Hinkle v. City of Clarksburg, 81 F.3d 416, 420 21 (4th Cir. 1996)). As decided above, plaintiffs have failed to show evidence sufficient to support a § 1983 claim. As a result, plaintiffs' official capacity claim must fail.

## CONCLUSION

Based on the foregoing, upon de novo review of those portions of the M&R to which objections were raised, and upon considered review of the remaining portions of the M&R, the court **ADOPTS** the recommendation of the magistrate judge as set forth herein. Defendants' motion for summary judgment (DE 24) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED this the 29th day of September, 2015.

_____
LOUISE W. FLANAGAN
United States District Judge